**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **BRIAN LARSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No: 12 C 4864** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cole** |
| **CAROLYN COLVIN,**[1] | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Brian Larson, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"). 42 U.S.C. §§ 423(d); 1382c(a)(3)(A). Mr. Larson asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

## PROCEDURAL HISTORY

Mr. Larson applied for benefits on July 14, 2006, alleging that he had become disabled on November 25, 2009, due to lumbar disc herniation and lower back pain causing weakness in his legs. (Administrative Record ("R.") 292, 332). His claim was

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Carolyn W. Colvin for Michael J. Astrue as the appellee.

denied initially and upon reconsideration. (R. 131-138). Mr. Haralson continued pursuit of his claim by filing a timely request for hearing. (R. 144).

An administrative law judge ("ALJ") convened a hearing on May 6, 2008, and denied Mr. Larson's application. (R. 109). Mr. Larson requested review of the decision and the Appeals Council remanded the case. (R. 121-22, 190). A second hearing was held on March 18, 2011, at which Mr. Larson, represented by counsel, appeared and testified. In addition, Dr. Sheldon Slodki testified as a medical expert and Thomas Dunleavy testified as a vocational expert. (R. 38-106). On April 15, 2011, the ALJ issued a decision finding that Mr. Larson was not disabled because he retained the capacity to perform a full range of light work. (R. 18-31). This became the final decision of the Commissioner when the Appeals Council denied Mr. Larson's request for review of the decision on May 25, 2012. (R. 1-6). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Haralson has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.

## THE EVIDENCE OF RECORD

### A.

### The Vocational Evidence

Mr. Haralson was born on September 18, 1979, making him thirty-one years old at the time of the ALJ's decision. (R. 292). He has a high school education. (R. 339). He has had a variety of jobs, most recently as a saw operator, which required him to

frequently lift and carry 50 pounds. (R. 333-34). Prior to that, he briefly worked as a receiving clerk at a casino and as a material handler. (R. 333).

## B.

### The Medical Evidence

The record in this case is a 1600-page morass of medical reports in no particular order. The distillation of all that is essentially that Mr. Larson has back pain despite a couple of surgical procedures and other treatments, and abdominal pain with diarrhea that was, for the most part, controlled with medication. His treating physician doesn't think he can perform any kind of work – not even sedentary work.

### 1.

### Back Issues

Mr. Larson had an MRI in September 2005 that revealed disc herniation at the L5-S1 level. (R. 1003). On November 21, 2005, Mr. Larson saw Dr. Michael Malek, a neurosurgeon, on a referral from Dr. Gustavo Pedraza. (R. 1002). He complained of low pain that had started in July 2005. Occasionally, he felt weakness in his legs. Walking was particularly bothersome and lying on his back aggravated his condition. Sitting relieved his discomfort for brief periods. Mr. Larson had three epidurals with no significant result. His reflexes were hypoactive, but straight leg raising and remainder of exam were within normal limits. He had no significant radicular pain. Dr. Malek referred him for physical therapy. (R. 1002-03).

About a week later, Mr. Larson was "pretty miserable." He said he couldn't really function with the pain (R. 1001). Dr. Malek told him if this was so, a spinal fusion

might be the best course. (R. 1001). Mr. Larson then had a discogram, which was positive at L5/S1. Dr. Malek discussed a range of options with Mr. Larson and told him to stop smoking. (R. 1000). On February 3, 2006, fusion was performed at L5-S1 with laminectomy, discectomy, instrumentation with cage, and grafting (R. 1024). On March 13, 2006, his x-rays looked excellent. Straight leg raising was negative. He had some paraspinal pain especially into the left buttock – this was to be expected post-surgery. (R. 998, 999).

X-rays were again excellent on May 1, 2006. He was kept off work until further notice. (R. 997). Three months after surgery, on June 5, 2006, Dr. Malek reported that Mr. Larson was doing excellently. He recommended he taper off wearing his brace off and sent him to physical therapy. (R. 996). X-rays taken on July 28, 2006, showed a compression deformity of T-12 (R. 1013). On August 7, 2006, plaintiff stated he was finishing his therapy and has a "job description" coming up. Dr. Malek recommended that it be "lighter duty and not involving any physical activity" (R. 995).

On September 29, 2006, Mr. Larson had a consultative examination that Disability Determination Services arranged. Mr. Larson said he felt a little better after his surgery but now had non-radiating pain that was 6/10 and achy; sometimes sharp. (R. 966). He also related a history of chronic abdominal pain due to Crohn's disease. He also had a history of depression, having attempted suicide six years earlier. (R. 966). Mr. Larson said he could walk two blocks, stand for 30 minutes and sit for 30 minutes at a time. He could lift 20 pounds. (R. 967). Range of motion in upper and lower extremities and cervical spine was normal, but lumbar flexion was limited to 30 degrees

out of 90, and extension was just 10 degrees. Straight leg raising was negative. (R. 968). There was moderate lumbar tenderness. Neurological exam was normal. (R. 968).

On October 4, 2006, Dr. Michael Nenaber, reviewed the medical record for the State Disability Agency, and concluded that Mr. Larson was capable of medium work activity – lifting 50 pounds and carrying 25, with occasional stooping and crouching. (R. 985). He noted that Mr. Larson was status post-fusion, with a lumbar range of motion limited to 30 out of 90 degrees, but had negative straight leg raising and could ambulate without assistance. (R. 992). Dr. Francis Vincent affirmed Dr. Nenabar's opinion on January 9, 2007. (R. 1125).

On November 6, 2006, Dr. Malek noted Mr. Larson was still complaining of pain and stiffness, but the doctor noted there was no tenderness. Physical therapy was helping and Dr. Malek said that would continue. (R. 994). A CT scan taken on November 14, 2006, showed significant soft tissue in the posterior paraspinal spaces at the operative sites which appeared to extend into the spinal canal and surround the thecal sac and likely represented post-operative scarring. The L5 right-sided screw appeared to breach the anterior vertebral body margin. There were minimal diffuse disc bulges at L3-4 and L4-5, mild spinal canal stenosis at L3-4, mild neural formainal narrowing at L4-5, and facet joint hypertrophy at L2-3, L3-4 and L4-L5 (R. 1004). The lumbar MRI taken November 14, 2006, showed a mild diffuse disc bulge at L4-5 causing minimal ventral impression on the thecal sac but no significant spinal stenosis, and mild neural foraminal narrowing (R. 1006). The MRI also showed enhanced post-operative scar tissue in the posterior paraspinal soft tissues at the surgical sites, and at the L4-5 and L5-S1 levels it does extend into the spinal canal to surround the thecal sac and extend into the lateral recesses. It is unclear if this was

causing any mass effect on the nerve roots.  (R. 1007).  On November 20, 2006, Dr. Malek noted the MRI showed no pathology at L4-L5, and that the discs above looked good, too.  Mr. Larson had decreased tolerance to certain activities such as being in a car for a period of time, but Dr. Malek said that would improve with time.  Physical therapy was continued.  (R. 1403).

On January 29, 2007, Mr. Larson still had significant achiness and pain, primarily in his back, with occasional tingling in his leg.  Dr. Malek recommended bilateral SI injections (R. 1402).  An MRI taken on January 31, 2007, revealed small mild anterior wedging of T12 and L1 with prominent endplate nodules from T11-L3, extradural defects from L2/L3-L4/L5 indenting the dural sac and extending into the spinal canal, and mild degenerative changes about the posterior facet joints in L3/L4.  Loss of signal from remaining L5/S1 disc space related to post-surgical changes and degenerative change (R. 1587-1588).

On February 19, 2007, Dr. Malek noted that Mr. Larson continued to complain of pain despite the epidural and sacroiliac injection.  A CT scan indicated some area within the bone where the fusion was not complete.   Dr. Malek recommended a discogram and prescribed Lyrica  (R. 1145).  On March 19, 2007, Dr. Malek reported that the discogram was positive above the fusion but the fusion had taken well.  He was unsure what was causing the pain and speculated it might be the metal itself.  He felt it was unlikely that removing the metal would result in significant improvement.   The doctor added that the problem might also be pseudoarthrosis.[2]  (R. 1144).  On April 10, 2007, Dr. Malek removed

---

[2] Pseudoarthrosis is the result of a failed attempt to fuse the spine. http://www.ncbi.nlm.nih.gov/pubmed/19652031.

all the hardware and re-did the fusion. (R. 1584). As of April 23rd, Mr. Larson was doing pretty well (R. 1143).

Mr. Larson was back to see Dr. Malek on May 9, 2007, after falling and landing on his buttocks. Straight leg raising was negative for radiculopathy, but reproduced back pain. X-rays looked good. Mr. Larson was wearing a back brace; Dr. Malek wanted to taper him off of that through water therapy and then land based therapy. He kept him off work (R. 1582). While Dr. Malek stated that there was solid fusion on the x-rays, the radiologist was more cautious, stating only that there may be a partial osseous union at the L5-S1 disc space (R. 1583). By June 25, 2007, Mr. Larson continued to have soreness in his back, but Dr. Malek remarked that his MRI looked really good with no pathology above the level of his fusion. (R. 1381).

Six weeks of water therapy yielded little improvement. Mr. Larson could ambulate farther and had lower extremity strength of 4+/5, but had poor sitting tolerance. His pain was generally 6-7 out of 10. His gait remained antalgic. (R. 1536-1537).

On October 17, 2007, Mr. Larson told Dr. Malek that he was applying for disability benefits. Dr. Malek indicated he would set him up with a functional capacity evaluation. (R. 1535). By March 10, 2008, Mr. Larson had "not had the chance" to undergo his functional capacity evaluation. (R. 1534). On March 26, 2008, Dr. Malek noted that x-ray showed excellent fusion. But he also noted that Mr. Larson suffered paraspinal pain and recommended another caudal epidural and bilateral S1 injection (R. 1532). On August 28, 2008, Dr. Malek reported that Mr. Larson was continuing to have

pain. He noted positive discography at L5-S1 and MRI evidence of disc herniation and dessication at that level. (R. 1580).

On October 15, 2008, Dr. Malek opined "…patient's pain level is to the point where I don't think he could work" (R. 1556). The injections he recommended were not covered by Mr. Larson's insurance. (R. 1552, 1556). A CT scan taken on October 30, 2008, revealed a mild posteriorly directed osteophyte formation at the L5/S1 level which contributed to moderate neural foraminal narrowing, and diffused disc bulges at L2/3, and L4/5 which contributed to mild central canal stenosis and possibly neural foraminal narrowing at L3/4, and mild to moderate bilateral neural foraminal narrowing at L4/5 (R. 1554-1555). On November 10, 2008, Dr. Malek stated he thought a lot of the problem could be related to next level disease.[3] He also noted some evidence of incomplete fusion. He ordered plain films to assess the posterolateral fusion (R. 1552-1553). On November 17, 2008, Dr. Malek reported that the x-ray showed excellent fusion posterolaterally, but Mr. Larson still complained of "persistent neuropathic pain, especially left sided." (R. 1547). Dr. Malek continued keeping him off work. (R. 1547).

Mr. Larson had an MRI and an EMG/NCV on January 20, 2009. (R. 1544-46). Dr. Malek reported that the MRI showed no evidence of focal pathology. There was mild bulging at L4-L5 but no significant narrowing. The EMG NCV showed denervation in bilateral and mid lumbar paraspinal musculature suggestive of either post-operative changes or chronic lumbar radiculopathy. The doctor noted Mr. Larson's chief complaint

---

[3] Spinal fusion can sometimes simply transfer the stress to the "next level" of the spine. http://www.spine-health.com/treatment/spinal-fusion/indications-two-level-spinal-fusion.

at that point was weakness after walking.  Dr. Malek felt it was probably related to underlying nerve pathology and could only be treated with exercise and therapy.  He changed Mr. Larson's medication from Lyrica to Elavil, and referred him to the pain clinic for spinal cord stimulation evaluation.  (R. 1540-1541).

On May 26, 2009, Mr. Larson was continuing to have insurance problems.  Dr. Malek reported that the  "Delay in authorization adversely affecting outcome both in terms of habituation to medication, psychological decline and affliction as well as decreased likelihood of functional return to work post-surgical rehabilitation as well as decreased likelihood of symptom resolution" (R. 1566).   The doctor provided an Attending Physician Statement of Disability stating that there were objective findings of disc bulge at L2-3, L3-4, L4-5 and neural foraminal narrowing at L4-5.  Dr. Malek stated that Mr. Larson initially had excellent results from treatment but regressed and needed a spinal cord stimulator. He opined that he has severe limitation of functional capacity and was incapable of even sedentary work (R. 1559-1560).

On August 3, 2009, Dr. Pedraza noted he still had swelling of his feet, even after holding the Diltiazem. Back pain was same. Sleep was poor. He stays awake until 3:00 a.m. He prescribed Klonopin for back pain (R. 1594). On August 5, 2009, Dr. Malek noted that the delay in approving the stimulator was adversely affecting the outcome of Mr. Larson's treatment. (R. 1563). On October 26, 2009, Dr. Malek provided another Attending Physician Statement, opining that Mr. Larson was totally disabled for any occupation and that his condition was permanent (R. 1562).  On December 16, 2009, Dr. Malek stated Mr. Larson's  insurance did not cover his back and his symptoms worsened

with changes in weather (R. 1577-1578).  On April 21, 2010, Dr. Malek reported that Mr. Larson was still miserable with his pain and kept him off work.  (R. 1575-1578).

## 2.

## Other Issues

Mr. Larson saw Dr. Ali Keshavarzian, on April 17, 2006, for evaluation of possible small bowel mass.  He complained of symptoms the doctor found compatible with irritable bowel syndrome and hemorrhoids. He had diffuse abdominal pain that became severe in December 2005, and had bothersome pain since then.  Mr. Larson admitted he smoked two packs a day.  (R. 1464-1465).  As of June 19, 2006, he still had constant right lower quadrant pain, sharp and severe and five to seven times a day liquid-like stool. There was mild diffuse abdominal tenderness on examination. (R. 1462-1463).  On August 7, 2006, Dr. KIeshavarzian diagnosed Crohn's disease. He prescribed Colestid and Entocort (R. 1461). On December 4, 2006, Mr. Larson's Crohn's disease was in remission, however, he continued to have abdominal pain which was clearly worsened by bending over and by lateral movements of his hip and back.  Dr. Keshavarzian concluded the abdominal pain was referred pain from his back.  (R. 1459).

Mr. Larson saw Dr. Rotnicki, a GI specialist, on June 13, 2007.  He complained of abdominal pain, vomiting after eating, and said he had lost 16 pounds in a couple of months.  (R. 1499).  On July 6, 2007, Mr. Larson continued to complain of upper abdominal pain right after eating.  The medication he was taking – Protinix and Symax were decreasing his pain and bowel movement frequency.  His Colestid was controlling his diarrhea.  (R. 1497).

On June 22, 2010, Dr. Pedraza noted he still had the same abdominal pain. Diagnosis included diabetes, Type II. (R. 1593). He had been diagnosed with Impaired Fasting Glucose on June 30, 2008. (R. 1604).

## C.

### The Administrative Hearing Testimony

#### 1.

#### The Plaintiff's Testimony

At his hearing, Mr. Larson testified that he lived with his parents. (R. 46). They had driven him to the hearing; he could drive, but no more than a half hour. (R. 47). He received disability insurance from the last place he worked. (R. 45). He explained that he took prescription medications for his Crohn's disease and Tylenol for his back. He also took hot showers and used a TENS unit. (R. 47-48). Pain medication aggravated his Crohn's disease. (R. 48).

Mr. Larson spent a typical day watching television or sitting outside if the weather was pleasant. (R. 49). He did no cooking or cleaning. He did drag his laundry downstairs in a basket on wheels. (R. 50). His mother did the housework and shopping. (R. 51). He had no hobbies. (R. 51). He sometimes visited his eight-year-old goddaughter. (R. 53). Mr. Larson didn't do much else; he explained that he couldn't handle sitting or standing a lot of times. (R. 53).

During the hearing, he rated his back pain as a 7/10. (R. 54). It sometimes radiated down to his legs when he was in one position too long. (R. 54). He thought he could lift about ten pounds but not for very long. (R. 54).

**2.**

**The Medical Expert's Testimony**

Dr. Slodki then testified as a medical expert. He apparently had not reviewed all of the records – he had not seen exhibits 33F or 34F. (R. 67). The doctor testified as to the records he did review, and first concluded – exclusive of any psychological disorders – that Mr. Larson did not meet any listed impairment. (R. 72-73). Mr. Larson's counsel agreed that there was no need to address Mr. Larson's depression and history of alcohol abuse because these were not severe impairments. (R. 89-90). Mr. Larson said they were not an issue. (R. 89). Dr. Slodki went on to determine that Mr. Larson was capable of performing light work as of January 2008. (R. 74-75). He did not agree with the opinion of Mr. Larson's treating physician that he was totally disabled. (R. 84).

**3.**

**The Vocational Expert's Testimony**

Mr. Dunleavy then testified as a vocational expert ("VE"). The ALJ first asked the VE whether a person with plaintiff's age, education and work experience, could lift 50 pounds and carry 25, and could occasionally stoop and crouch would be able to perform Mr. Larson's past work. The VE said that such an individual could not perform such work due to the postural limitations. (R. 95). But he also said that an individual with the foregoing limitations would be able to perform other work, specifically, laundry worker, dishwasher, or hand packager. There were approximately 5,000 laundry worker jobs in Illinois, 20,000 dishwasher jobs, and 20,000 hand packager jobs. (R. 96). If the hypothetical individual were limited to a full range of light work, vocational testimony

would be unnecessary because the ALJ could simply consult the Medical-Vocational Guidelines ("Grid"). (R. 96-98).

If a person had to lean on something when they were standing, that would rule out light work but a number of sedentary jobs would remain, including assembler (8,000 positions), sorters (2,000), and touch up screeners (4,000). (R. 100). The VE didn't think a person who needed to elevate his feet every hour would be accommodated that those positions. (R. 103-04).

## D.

### The ALJ's Decision

The ALJ found that Mr. Lawson suffered from the following severe impairments: "low back impairment status post fusion surgery, irritable bowel syndrome, gastroesophageal reflux disease, controlled iniod [sic] Crohn's disease, hemorrhoids, appendicitis, rheumination [sic] syndrome (effortless regurgitation of meals), and hypertension." (R. 22). She further found that Mr. Lawson did not have an impairment or combination of impairments that met or equaled a listed impairment. (R. 22-23). Next, the ALJ summarized the evidence in the medical record and discussed Mr. Lawson's testimony, and determined that he could perform a full range of light work. (R. 23-28).

The ALJ found Mr. Lawson "less than fully credible." (R. 29). She felt that the medical evidence did not support the extent of his allegations and noted that he did not take prescription pain medication. (R. 29-30). Despite the fact that Crohn's disease is a wasting sickness and Mr. Larson alleged frequent vomiting, he had gained weight since

his alleged onset date. (R. 30). Objective evidence regarding Mr. Larson's intestinal issues showed no more than mild impairments. (R. 30).

The ALJ rejected the opinion of Mr. Larson's treating physician in favor of the opinion of the medical expert, Dr. Slodki, who felt Mr. Larson could do light work. (R. 29). She explained that Dr. Malek's opinion that Mr. Larson was disabled was contrary to his treatment notes and the record as a whole. She felt it was based in large part on Mr. Larson's complaints. (R.29). The ALJ found Dr. Slodki's opinion to be consistent with the record and she adopted it as her own. (R. 29).

Given Mr. Larson's age, education, work experience, and capacity for a full range of light work, the ALJ employed the Medical Vocational Guidelines to find Mr. Larson not disabled. (R. 30-31). Therefore, he was not entitled to benefits under the Act. (R. 31).

## IV.

## DISCUSSION

### A.

### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471,

475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). It has also called this requirement a "lax" one. *Berger*, 516 F.3d at 544.

**B.**

**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.

### Analysis

Mr. Larson first argues that the ALJ erred by not according controlling or adequate weight to the opinion of his treating physician. Second, he submits that the ALJ ought not to have relied upon the testimony of Dr. Slodki because he didn't review the entire record and made mistakes reviewing the record. Third, he contends the ALJ erred by failing to include any postural limitations in his residual functional capacity finding. Finally, he says that the ALJ failed to adequately assess his credibility.

### 1.

A treating physician's opinion is entitled to controlling weight unless it is not supported by the physician's records or is inconsistent with the reports of other sources. 20 C.F.R. § 404.1527(d)(2); *Scott v. Astrue,* 647 F.3d 734, 739 (7th Cir. 2011). An ALJ who concludes that such an opinion is not entitled to controlling weight must give good reasons for that conclusion. *Martinez v. Astrue,* 630 F.3d 693, 698 (7th Cir.2011); *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir.2011); The ALJ determined that Dr. Malek's opinion was entitled to little weight because it was inconsistent with his treatment notes and the record as a whole. The ALJ noted that Dr. Malek repeatedly referred to x-rays indicating that the spinal fusion looked fine. The ALJ also said Dr. Malek based his opinion that Mr. Larson could not work in large part on Mr. Larson's subjective complaints because he indicated his pain was at a level where he could not work and his treatment notes did not include many physical examination findings. The ALJ also criticized Dr. Malek's opinion as contradictory to Dr. Slodki's. Finally, the ALJ

explained that the determination of the claimant's residual functional capacity was reserved to the Commissioner. (R. 29).

First, while the ultimate question of whether a claimant is disabled to a degree to qualify for benefits is, indeed, a matter reserved to the Commissioner – and the Commissioner's delegate, the ALJ, 20 C.F.R § 404.1527(d) – that's not a valid reason to accord a treating physician's opinion little weight. *See Moore v. Colvin*, – F.3d –, –, 2014 WL 763223, *7 (7th Cir. 2014)(ALJ could not simply dismiss treating physician's opinion that claimant was disabled due to that issue being reserved to the Commissioner); *Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013)(ALJ could not simply reject treating physician's opinion on the ground that the issue of disability was reserved to the Commissioner). If it were a valid reason, then every treating physician's opinion in every case would be worthless.

Second, while an ALJ may reject a treating physician's opinion if it is based on the claimant's subjective complaints, *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008), that was not the case here. Dr. Malek was Mr. Larson's treating physician and surgeon. He had an extended treating history with him. Along the way, Dr. Malek reviewed any number of objective studies. Nearly all of his notes refer to results from studies like MRIs or CT scans. These led him to believe that Mr. Malek needed not one, but two spinal fusions.[4] As such, it was not as though there was an absence of evidence

---

[4] Both the ALJ and the Commissioner focus on Dr. Malek's occasional comments that x-rays showed the Mr. Larson's spine fusion looked good. (R. 29; *Defendant's Memorandum,* at 5). But MRIs, CT scans, and discograms revealed other problems. Moreover, the fusion may have looked good originally, but ultimately had to be redone. And while the second fusion may have looked good originally, later studies revealed evidence that the fusion was incomplete.

to verify the pain Mr. Larson claimed he was suffering. *See Parker v. Astrue*, 597 F.3d 920, 922 (7ᵗʰ Cir. 2010).

The doctor also felt that Mr. Larson was a candidate for an implantation of a stimulator – yet another surgical procedure. This plan was scotched due to the limits of Mr. Larson's health insurance. Dr. Malek was not simply accepting Mr. Larson's complaints of pain and dispensing pain pills. He was pursuing a rather aggressive course of treatment. The ALJ was wrong to reject his opinion as based solely on Mr. Larson's subjective complaints. *Moore*, – F.3d at –, 2014 WL 763223, 7 (ALJ was wrong to dismiss doctor's opinion because it was based on claimant's complaints of pain where doctor was providing course of pain management not based on drugs); *Parker*, 597 F.3d at 922-23 (ALJ was wrong to brush aside doctor's statement that claimant had disabling pain). Accordingly, this matter must be remanded to the Commissioner.

**2.**

Another reason the ALJ rejected the opinion of Mr. Larson's treating physician was because he favored the opinion of Dr. Slodki, the medical expert. If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7ᵗʰ Cir. 2009). Dr. Slodki, of course, never examined Mr. Larson and did not review the entire record, while Dr. Malek treated Mr. Larson regularly over the course of a few years and consulted with his general practitioner. This favors Dr. Malek's opinion over that of Dr.

Slodki. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011); *Suide v. Astrue*, 371 Fed.Appx. 684, 689 (7th Cir. 2010). Dr. Malek is a spinal surgeon, while Dr. Slodki is an internist. This factor, too, weighs in favor of Dr. Malek's opinion. Yet, the ALJ still went with Dr. Slodki.

The ALJ hung his hat on his perception that Dr. Slodki's opinion was more consistent with the record than that of Dr. Malek. But it's unclear how. As noted, Dr. Slodki did not review the entire record. His file was missing exhibits 33F and 34F, about 80 pages of medical evidence. As noted, the record is a bit of a mess, so many of these records may have been duplicative of records Dr. Slodki did review. But, his testimony reveals that he did struggle with the timeline of Mr. Larson's course of treatment. According to Dr. Slodki, Mr. Larson improved after his first fusion, then suffered a fall that led to a regression and increase of his symptomatology, ultimately necessitating a second surgery to take care of it. (R. 74). That's wrong. The original fusion – performed in February 2006 – failed and a second had to be performed in April 2007. Mr. Larson had his fall and regression shortly after that, in May 2007. So if, as Dr. Slodki says, the evidence shows the fall showed regression of symptomatology, no surgery ever corrected it.

Dr. Slodki also seems to ignore the numerous MRIs, CT scans, and discograms in the record. He indicates that Mr. Larson can perform a full range of light work, without any postural limitations like limited stooping or crouching. (R. 80). Dr. Slodki based his opinion, in substantial part, on the fact that x-rays failed to show significant abnormality after the second fusion. (R. 80). But, as already noted, the other types of tests were not

so positive and, by November 2008, even belied the x-rays that indicated the second fusion looked good. Dr. Slodki also supported his opinion with the assertion that people who have fusion surgery can generally do everything after a complete program of physical therapy. (R. 80). That really doesn't speak to Mr. Larson's situation at all. In Mr. Larson's case, the record demonstrates that therapy was essentially unsuccessful.

Moreover, Dr. Slodki's opinion runs counter to that of the physicians who reviewed the record in October 2006 and January 2007; both said Mr. Larson could only occasionally stoop or crouch. According to Dr. Slodki, Mr. Larson's condition didn't improve after those dates. He stated that after April 2007, Mr. Larson "never got better." (R. 77). Despite all this, if the ALJ truly felt that Dr. Slodki's opinion was more consistent with the record that Dr. Malek's, he had to thoroughly explain why. It is certainly not apparent that it is from the record. This, too, necessitates a remand.

### 3.

Given that this case must be remanded, we need not address at length the ALJ's credibility finding – but a few points are worth making. The ALJ found Mr. Larson's complaints of disabling back pain not credible for two reasons: the objective tests – MRIs, CT scans, discograms, etc. – did not support that level of severity and Mr. Larson did not take prescription pain medication. (R. 29-30). The Seventh Circuit has had much to say with regard to the first reason. On the one hand, the court has allowed – repeatedly – that a discrepancy between a claimant's allegations and the medical evidence may support a finding that the claimant is exaggerating his symptoms. *See, e.g., Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010); *Seamon v. Astrue*, 364 Fed.Appx. 243, 250

(7th Cir. 2010); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Sienkiewicz v. Barnhart,* 409 F.3d 798, 804 (7th Cir. 2005).

But, on the other hand, it has also said that an ALJ may not discredit a claimant's testimony based on the medical evidence alone. *See, e.g.., Thomas v. Colvin*, – F.3d –, –, 2014 WL 929150, 3 (7th Cir. 2014); *Moore*, – F.3d at –, 2014 WL 763223, 6; *Bjornson v. Astrue*, 671 F.3d 646, 648 (7th Cir. 2012). Judge Posner put it this way in *Parker*:

> We do not suggest that the absence of verifiable medical evidence of pain is an inadmissible consideration in a disability proceeding. In some cases, pain *does* have an objectively verifiable source, and if so the administrative law judge may certainly treat this as evidence that the claimant is disabled. And if the presence of objective indicators thus makes a claim more plausible, their absence makes it less so. It would be a mistake to say "there is no objective medical confirmation of the claimant's pain; therefore the claimant is not in pain." But it would be entirely sensible to say "there is no objective medical confirmation, and this reduces my estimate of the probability that the claim is true." The administrative law judge said the first, not the second.

597 F.3d at 922-23.

In the instant case, there *was* medical confirmation of Mr. Larson's pain. It would seem, therefore, that the ALJ had to explain why, for example, MRI evidence of disc herniation and bulging – which is perfectly consistent with Mr. Larson's claim of pain – was inconsistent with the level of pain claimed by Mr. Larson. He could not simply summarize the evidence and say it didn't support Mr. Larson's allegations. Just as an expert's *ipse dixit* is not acceptable, *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997); *Wendler & Ezra, P.C. v. American Intern. Group, Inc.,* 521 F.3d 790, 791 (7th Cir.2008), neither is an ALJ's. That is the whole point of the logical bridge requirement.

The ALJ's other reason for discrediting Mr. Larson's allegations regarding his back pain is also troubling. Mr. Larson doesn't take prescription pain medication due to his Crohn's disease. Even Tylenol bothers his stomach. That being the case, the failure to take pain medication at least potentially has absolutely no relevance. Analytically, it isn't any different than ALJ's rejection of claims of pain because the claimant did not go to a hospital because she had no funds and no insurance. The ALJ improperly ignored Mr. Larson's serious medical condition that would have explained his failure to take medicine and thus made improper the ALJ's adverse determination. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012)(ALJ must explore the reasons for failing to seek treatment including intolerable side effects of medication). It's not as if Mr. Larson was lax about seeking relief from pain. He had two surgeries and would have had another to implant a stimulator had his insurance been better. The ALJ's failure to discuss any of this is mystifying.

## CONCLUSION

The plaintiff's motion for remand [Dkt. #16] is GRANTED, and the Commissioner's motion for summary judgment is DENIED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 3/19/14